IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LASHONDRA MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 17-0500-WS-N |
| | ) | |
| GPS HOSPITALITY PARTNERS IV, | ) | |
| LLC, etc., | ) | __PUBLISH__ |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment and the plaintiff's motion for partial summary judgment.  (Docs. 50, 51).  The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 50-52, 54-55, 58-59), and the motions are ripe for resolution.  After careful consideration, the Court concludes that the defendant's motion is due to be denied and the plaintiff's motion granted in part and denied in part.

## BACKGROUND

According to the amended complaint, (Doc. 9), the plaintiff was employed by the defendant, the owner of a number of Burger King restaurants.  The plaintiff sought FMLA leave in February 2017 to care for her hospitalized mother but did not receive such leave and instead was terminated days later.  The complaint asserts claims for interference with the plaintiff's FMLA rights and retaliation for exercising those rights.  The defendant seeks summary judgment as to both claims. The plaintiff seeks summary judgment as to her interference claim.

**DISCUSSION**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving

party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

## I.  Interference Claim.

"It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  "An interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA; and (2) her employer denied her that benefit." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

The first element identified in *White* subsumes several sub-elements.  As relevant to this case, these include the following:  (1) that the defendant is a covered entity; (2) that the plaintiff is eligible for FMLA benefits; (3) that the plaintiff sought leave for a qualifying reason; and (4) that the plaintiff provided notice meeting certain criteria.[1]  The defendant's argument targets only this final sub-element of the first element; however, because the plaintiff moves for summary judgment on her interference claim, the Court must consider all elements of that claim.

---

[1] Eleventh Circuit Pattern Jury Instructions (Civil) 4.16 (2013).

### A.  Covered Entity.

The defendant must be an "employer" that is "engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C. § 2611(4)(A)(i).  The defendant admits that this requirement is satisfied.  (Doc. 9 at 2, ¶ 7; Doc. 15 at 2, ¶ 7).

### B.  Eligibility.

To be eligible to receive FMLA benefits, the plaintiff must have "been employed … for at least 12 months by the employer with respect to whom leave is requested … and … for at least 1,250 hours of service with such employer during the  previous 12-month period."  29 U.S.C. § 2611(2)(A).  In addition, the plaintiff must be employed at a worksite where, or within 75 miles of which, the defendant employs at least 50 employees.  *Id*. § 2611(2)(B)(ii).  The defendant admits that all parts of these requirement but one are satisfied.  (Doc. 9 at 2, ¶¶ 5, 7; Doc. 15 at 2, ¶¶ 5, 7).

The defendant in its answer does not admit that the plaintiff had been employed by the defendant for at least twelve months, but neither does it dispute the plaintiff's assertion that she is an eligible employee.  (Doc. 50 at 13).  It is uncontroverted that the defendant became the plaintiff's employer in December 2016, less than two months before the plaintiff was terminated.[2]  It is also uncontroverted, however, that the defendant in December 2016 purchased 190 Burger King restaurants, including the plaintiff's store, from Strategic Solutions ("Strategic"), and that the defendant retained the employees of Strategic,

---

[2] (Doc. 52-3 at 5).

transitioning them directly into employment by the defendant, complete with retention of entitlement to benefits, including FMLA eligibility.[3]

The term "employer" includes "any successor in interest of an employer." 29 U.S.C. § 2611(4)(A)(ii)(II).  The relevant factors include:  (1) substantial continuity of the same business operations; (2) use of the same plant; (3) continuity of the work force; (4) similarity of jobs and working conditions; (5) similarity of supervisory personnel; (6) similarity in machinery, equipment, and production methods; (7) similarity of products or services; and (8) the ability of the predecessor to provide relief.  29 C.F.R. § 825.107(a).

The first seven factors all plainly support successor status:  the defendant purchased almost 200 Burger King restaurants and retained all personnel and equipment to provide the same products in the same manner and by the same means at the same locations.  The final factor is relevant only when the successor is sought to be held liable for the infractions of the predecessor and so is not relevant here.[4]

"A successor which meets FMLA's coverage criteria must count periods of employment and hours of service with the predecessor for purposes of determining employee eligibility for FMLA leave."  29 C.F.R. § 825.107(c).  Because the defendant is Strategic's successor, and because the defendant meets the FMLA's coverage criteria, the plaintiff's length of employment with Strategic must be added to her two months with the defendant to determine her eligibility.  It is uncontroverted that the plaintiff was employed by the defendant's predecessor for

---

[3] (*Id.*).

[4] "[T]his factor is inapplicable to FMLA claims arising after the transition from old employer to new employer."  *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 786 (9th Cir. 2010).

several years before the defendant's acquisition.[5]  The plaintiff therefore satisfies the FMLA's eligibility requirements.

### C.  Qualifying Reason.

An eligible employee may receive FMLA leave "in order to care for the … parent  … of the employee, if such … parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  A "serious health condition" includes "an illness, injury, impairment, or physical or mental condition that involves … inpatient care in a hospital …."  *Id*. § 2611(11)(A).  It is uncontroverted that the plaintiff's mother was hospitalized from February 5, 2017 to well past the termination of the plaintiff's employment and that the plaintiff provided care to her mother throughout this period.[6]  The plaintiff therefore sought leave for a qualifying reason.

### D.  Employee Notice.

A plaintiff "must also give her employer notice of her need for leave, … and she can state an interference claim only if she gave proper notice …."  *White*, 789 F.3d at 1195.  Notice "must satisfy two criteria – timing and content," and the parameters of these criteria depend on whether the need for leave is "foreseeable" or "unforeseeable."  *Id*.

The defendant does not challenge the content or timing of the plaintiff's notice.  Instead, the defendant argues the plaintiff gave no lawful notice because she did not follow the procedures set forth in the defendant's FMLA policy.  The defendant asserts no other argument in support of its motion for summary judgment as to the plaintiff's interference claim.

---

[5] (Doc. 50-4 at 24).

[6] (*Id*. at 31-33).

In the case of foreseeable leave:

> An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, … [a]n employee … may be required by an employer's policy to contact a specific individual. … Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

29 C.F.R. § 825.302(d).

A substantively similar provision applies to unforeseeable leave:

> [A]n employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. … If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.

*Id*. § 825.303(c).

### 1. "Usual and customary notice and procedural requirements for requesting leave."

As discussed in Part I.E, it is uncontroverted that the plaintiff repeatedly contacted her store manager (Owes) and the district manager (Morrissette) to request leave to care for her hospitalized mother. The defendant argues these communications did not suffice because the plaintiff did not also notify Human Resources of her need for leave. The defendant's FMLA policy, as expressed in its employee handbook, includes the statement that "[e]mployees should notify their supervisor and Human Resources for approval for a leave"; the policy later states that "[a]ll employees requesting FMLA leave must provide Human Resources with verbal or written notice of the need for the leave."[7]

---

[7] (Doc. 52-4 at 20-21).

The defendant assumes that an employer's "usual and customary notice and procedural requirements for requesting leave" means, when the employer has an FMLA policy addressing such matters, the employer's requirements for requesting FMLA leave specifically, even if those requirements differ from, and are more onerous than, its requirements for requesting leave in general.  The defendant cites a number of cases that indulge the same assumption without subjecting it to critical analysis.[8]  For reasons that follow, the Court rejects this reading of the regulations and concludes that the relevant notice and procedural requirements are those governing leave generally, not FMLA leave specifically.

As always, analysis begins with the text.  The regulations speak in terms of the usual and customary requirements for requesting "leave," not those for requesting "FMLA leave."  The Department of Labor ("DOL") knew the difference, as it uses the terms "FMLA leave," "FMLA-qualifying leave" and "FMLA-protected leave" at least ten times in Section 825.302.  The regulation also uses the unadorned "leave" repeatedly, but the context makes clear what is intended.  Subsections (a), (b) and (c) are each introduced with the phrase, "FMLA leave" or "FMLA-qualifying leave," and subsequent usages of "leave" within those subsections plainly refer to the FMLA leave mentioned initially.  Subsection (f) addresses intermittent or reduced-schedule leave and so obviously addresses FMLA leave.[9]

Subsection (d) is different, as it begins with five consecutive references to "leave," the first of which is the presently relevant grant of permission to enforce compliance with the employer's usual and customary requirements "for requesting leave."  As subsections (a), (b) and (c) reflect, if these requirements were those for requesting "FMLA leave" specifically, subsection (d) would have followed the pattern of the preceding subsections and employed that phrase to introduce the

[8] *E.g., Hunt v. Altec Industries, Inc.*, 2015 WL 5602437 at *7 (N.D. Ala. 2015).

[9] Subsection (e) refers once to "FMLA leave" and does not refer to "leave."

8

provision.  Moreover, the first usage of "FMLA leave" in subsection (d) appears in
the following sentence:

> Unusual circumstances would include situations such as
> when an employee is unable to comply with the employer's
> policy that requests for *leave* should be made by contacting
> a specific number because on the day the employee needs to
> provide notice of his or her need for *FMLA leave* there is no
> one to answer the call-in number and the voice mail box is full.

29 C.F.R. § 825.302(d) (emphasis added).  This phraseology clearly distinguishes
between the employer's policy (leave generally) and the employee's request
(FMLA leave specifically).

"In interpreting statutory text, we ordinarily presume that the use of
different words is purposeful and evinces an intention to convey a different
meaning."  *Abbott v. Abbott*, 560 U.S. 1, 33 (2010) (Stevens, J., dissenting).  The
agency's use of "leave" rather than "FMLA leave" in subsection (d) must be
presumed to be purposeful and to reflect its intention that the usual and customary
requirements an employer may enforce in the FMLA context are those generally
applicable to other forms of leave.

Under Section 825.303, "in the case of an emergency requiring leave
because of a FMLA-qualifying reason, written advance notice pursuant to an
employer's internal rules and procedures may not be required when FMLA leave
is involved."  29 C.F.R. § 825.303(c).  This language similarly reflects that the
employer's "usual and customary notice and procedural requirements for
requesting leave" (its internal rules and procedures) means those applying both
"when FMLA leave is involved" and when other forms of leave are involved.

Other regulatory provisions further support the proposition that the relevant
employer requirements are those applicable to leave in general.  First, "[a]n
employee giving notice of the need for FMLA leave does not need to expressly
assert rights under the Act or even mention the FMLA to meet his or her
obligation to provide notice …."  29 C.F.R. § 825.301(b).  This principle is

repeated for both foreseeable leave, *id*. § 825.302(c), and unforeseeable leave. *Id*.
§ 825.303(b). These provisions protect an employee from being denied FMLA
leave based on the employee's lack of understanding that her need for leave is
potentially FMLA-qualifying. It would seem a curious regime that would grant
such protection only to effectively negate it by requiring the employee to follow
an explicitly FMLA-specific notice procedure – which she would do only if she
understood that her leave could be FMLA-qualifying.

Second, "the employer may take appropriate action under its internal rules
and procedures for failure to follow its usual and customary notification rules,
absent unusual circumstances, as long as the actions are taken in a manner that
does not discriminate against employees taking FMLA leave." 29 C.F.R. §
825.304(e). It would seem difficult to discriminate in the enforcement of
notification rules unless the same rules apply to both FMLA leave and non-FMLA
leave.

The language of the regulations readily supports a reading that restricts the
"usual and customary notice and procedural requirements for requesting leave" to
those requirements applicable to leave generally and that does not permit
employers to deny leave based on a failure to comply with more stringent notice
and procedural requirements applicable to FMLA requests but not to other forms
of leave. Even could the regulations also reasonably be construed otherwise, the
agency's understanding as to the scope of the regulations resolves any ambiguity
against the defendant's position.

"Because the salary-basis test is a creature of the Secretary's own
regulations, his interpretation of it is, under our jurisprudence, controlling unless
plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S.
452, 461 (1997) (internal quotes omitted). This is especially so when "there is no
indication that [the agency's] current view is a change from prior practice or a *post
hoc* justification adopted in response to litigation." *Decker v. Northwest
Environmental Defense Center*, 568 U.S. 597, 614 (2013). "*Auer* deference is

warranted only when the language of the regulation is ambiguous." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000).  In sum, "*Auer* deference provides that when a regulation is ambiguous, we defer to the promulgating agency's interpretation of that regulation, unless its construction is plainly erroneous or inconsistent with the regulation[,] [a]s long as the agency's interpretation … reflects [its] fair and considered judgment on the matter in question." *United States v. Phifer*, 909 F.3d 372, 382-83 (11th Cir. 2018) (internal quotes omitted).

Courts may look to a regulation's preamble to resolve ambiguity in the regulation.  *E.g., Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 158 & n.13 (1982); *Watkins v. City of Montgomery*, 775 F.3d 1280, 1284 (11th Cir. 2014).  This only makes sense, given that the preamble evidences the agency's contemporaneous understanding of its rules.  *Halo v. Yale Health Plan*, 819 F.3d 42, 52-53 (2nd Cir. 2016).

By its terms, the FMLA became effective on August 5, 1993.  DOL issued its interim final rule in June 1993, to take effect on the Act's effective date.[10] Section 825.302(d) provided that an employer "may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave without pay."[11]  Because "[t]he FMLA requires only unpaid leave," *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 739 (2003), "without pay" would be hopelessly redundant were "leave without pay" construed to mean "FMLA leave without pay."  Because courts should "avoid a reading which renders some words altogether redundant," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995), the relevant notice and

---

[10] The Family and Medical Leave Act of 1993, 58 Fed. Reg. 31,794 (Jun. 4, 1993).

[11] *Id.* at 31,827.  Section 825.303 did not include any language regarding compliance with the employer's usual and customary requirements with respect to unforeseeable leave.  *Id.*

procedural requirements must be those applicable to leave without pay generally and not those specially applicable to FMLA leave.

The agency's final rule was published in January 1995.[12]  With respect to Section 825.302(d), the final rule traced the interim final rule but deleted the concluding words, "without pay."[13]  The preamble to Section 825.302 specifies that:

> The employee is required to provide notice of need to take FMLA leave to the *same person*(s) within the company the employee *ordinarily contacts to request other forms of leave*, usually the employee's supervisor.  It is the responsibility of the supervisor either to refer the employee … to the appropriate person, or to alert that person to the employee's notice.  Once the employee has provided notice to the supervisor or other appropriate person in the *usual manner*, the employee's obligation to provide notice of the need for FMLA leave has been fulfilled.[14]

This language makes clear that the notice requirements the employer may enforce are the "usual" ones applicable to "other forms of leave."

Section 825.302(g) of the 1995 regulation confirms the importance of the employer's generally applicable notice requirements.  When an employee substitutes paid vacation leave for unpaid FMLA leave "and the employer's paid vacation leave plan imposes no prior notification requirements for taking such vacation leave, no advance notice may be required for the FMLA leave taken in these circumstances"; similarly, when an employee takes unpaid FMLA leave, "FMLA notice requirements would apply to a period of unpaid FMLA leave, unless the employer imposes lesser notice requirements on employees taking leave

---

[12] The Family and Medical Leave Act of 1993, 60 Fed. Reg. 2,180 (Jan. 6, 1995).

[13] *Id*. at 2,257.  Section 825.303 again did not include any language regarding compliance with the employer's usual and customary requirements with respect to unforeseeable leave.  *Id*.

[14] *Id*. at 2,220 (emphasis added).

without pay."[15]  In both cases, the relevant employer notice rules are the employer's generally applicable ones, not special ones designed specifically for FMLA leave.[16]

In 2007, DOL solicited public comment regarding the Act and the effectiveness of its implementing regulations.[17]  Commenters expressed frustration with then-current Section 825.302(d)'s prohibition on delaying or denying FMLA leave for failure to follow the employer's usual and customary notice and procedural requirements for requesting leave, which the agency distilled as seeking permission to enforce generally applicable leave requirements in the FMLA context.[18]

The following year, DOL published a notice of proposed amendments to its FMLA regulations.[19]  The preamble to proposed Section 825.302(d) states that the amended version "retains the current rule providing that an employer may require an employee to comply with the employer's usual notice and procedural requirements for calling in absences and requesting leave,"[20] which it equated with "employer absence policies" and "normal leave policies"[21]; each phrasing

---

[15] *Id*. at 2,258.

[16] The interim final rules included a similar provision.  58 Fed. Reg. at 31,827.

[17] Family and Medical Leave Act Regulations:  A Report on the Department of Labor's Request for Information, 72 Fed. Reg. 35,550 (Jun. 28, 2007).

[18] "Employers also identified as an area of concern … their inability to enforce routine call-in procedures.  …  Employers asserted that the call-in procedures, which are enforced routinely outside the FMLA context, are often critical to an employer's ability to ensure appropriate staffing levels."  *Id*. at 35,576.  "Several stakeholders recommended allowing employers to enforce employee compliance with established attendance and leave notification procedures …."  *Id*. at 35,585.

[19] The Family and Medical Leave Act of 1993, 73 Fed. Reg. 7,876 (Feb. 11, 2008).

[20] *Id*. at 7,909.

indicates generally applicable policies.  The agency also acknowledged that "call-in procedures, which are enforced routinely outside the FMLA context, can serve as a crucial element of an attendance program,"[22] again reflecting that the agency was contemplating requirements of an employer's entire "attendance program," not special requirements for requesting FMLA leave.

The preamble to proposed Section 825.303(c) (a new provision designed to parallel Section 825.302(d) with respect to unforeseeable leave) states that, if "an employer requires that workers needing unscheduled leave call a designated call-in number," absent unusual circumstances the employer "may treat the employee's failure to comply with the call-in rule in the same manner it would normally handle such an infraction"[23]; that is, the same call-in rule applies to all unscheduled absences, not just FMLA unscheduled absences.

Finally, the preamble to proposed Section 825.304 states that "an employer can take disciplinary action for the employee's violation of the employer's internal call-in procedures, *as long as such procedures* and discipline *are applied equally to employees taking leave for non-FMLA reasons* …."[24]  Explicitly, then, the "usual and customary notice and procedural requirements for requesting leave" that an employer may enforce in the FMLA context are limited to those that are also applicable in the non-FMLA context.

The agency issued its final rule in November 2008, effective January 2009,[25] giving Sections 825.302(d) and 825.303(c) their current form.  The

---

[21] *Id*.

[22] *Id*.

[23] *Id*. at 7,911.

[24] *Id*. (emphasis added).

[25] The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67,934 (Nov. 17, 2008).

preamble summarized responses to the proposed changes to the former section as follows:  employees objected to allowing employers to delay or deny FMLA leave for failure to comply with the employer's usual requirements for requesting leave, while employers "argued that employees should be required to follow *the same procedures* for requesting leave regardless of whether their need for leave was covered by the FMLA."[26]  The agency agreed with the employers' position: "[C]all-in procedures are *routinely enforced* in the workplace and are critical to an employer's ability to ensure appropriate staffing levels.  …  The Department believes that employers should be able to enforce *non-discriminatory* call-in procedures" in the FMLA context.[27]  Both quotes reflect that the only internal procedures an employer may enforce with respect to FMLA leave are those also applicable to other forms of leave.

Based on all these demonstrations of DOL's contemporaneous, fair and considered judgment as to the meaning of its regulations, which understanding is neither plainly erroneous nor inconsistent with the regulations themselves, the Court concludes that any ambiguity in the scope of Sections 825.302(d) and 825.303(c) is to be resolved in favor of the construction that the "usual and customary notice and procedural requirements for requesting leave" that an employer may require an employee to comply with, the violation of which permits the employer to delay or deny FMLA leave, are limited to those requirements applicable to leave generally and do not extend to more stringent requirements the employer imposes on FMLA leave requests in particular.

Other courts have concluded or assumed that Sections 825.302(d) and 825.303(c) refer to an employer's generally applicable leave requirements.  *See, e.g., Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008 (10th Cir. 2011)

---

[26] *Id*. at 68,005 (emphasis added).

[27] *Id*. (emphasis added).  Similar language is found in the preamble to Section 825.303(c).  *Id*. at 68,009.

("[A]n employer generally does not violate the FMLA if it terminates an employee for failing to comply with a policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA*"; the Court applied the employer's general attendance policy rather than its FMLA policy) (emphasis in original); *Bones v. Honeywell International, Inc*., 366 F.3d 869, 878 (10th Cir. 2004) ("Bones' request for FMLA leave does not shelter her from the obligation, which is the same as that of any other Honeywell employee, to comply with Honeywell's … absence policy."); *Lewis v. Holsum, Inc*., 278 F.3d 706, 710 (7th Cir. 2002) ("Holsum's [generally applicable] company rules and Attendance Policy are 'usual and customary' requirements.").  The Court concurs and offers herein a rationale supporting this conclusion.

It is not clear whether the plaintiff's leave should be classified as foreseeable or unforeseeable.  The distinction is immaterial for present purposes, because the defendant does not require an employee to contact Human Resources for any absence other than FMLA, whether scheduled or unscheduled.[28]  Because the defendant could not properly refuse the plaintiff FMLA leave for failure to contact Human Resources, its motion for summary judgment must fail.

### 2. "Unusual circumstances."

Even were Sections 825.302(d) and 825.303(c) to be read as the defendant desires, its motion would still be denied.  Both sections preclude the employer from delaying or denying FMLA leave when "unusual circumstances justify" the employee's failure to comply with the employer's usual and customary notice and procedural requirements for leave.  The plaintiff argues that this case presents unusual circumstances justifying her failure to contact Human Resources.  The Court agrees.

The following facts are uncontroverted.  In late November 2016, as it was finalizing its acquisition of 190 stores, the defendant required its newly acquired

---

[28] (Doc. 52-4 at 14, 18-19, 22-23).

employees to complete and/or sign a number of online documents.  These included at least:  a job application; a W-4; an I-9; payroll documents; and the 31-page employee handbook.[29]  Employees in the plaintiff's store were required to come to the office, log in and complete all these tasks while on the clock and working a shift, and they took an average of ten minutes to complete all these assignments; the defendant did not instruct Owes to ensure that employees had enough time to read the handbook, and Owes did not tell the plaintiff to take the necessary time.[30]  The plaintiff did not read the handbook or its 2½-page FMLA policy, because she did not have time to do so, since she was running a shift; indeed, it was not possible to complete all the paperwork and read the handbook in ten minutes.[31]  The plaintiff did electronically sign or initial the final page of the handbook eight times, including to acknowledge that she had received a copy of the handbook and that she understood her responsibility to read and comply with its policies.[32]  She did not, however, actually receive a physical copy of the handbook.[33]  Nor did the defendant conduct any training in the plaintiff's store regarding the handbook in general or the FMLA policy in particular.[34]

When completing her online paperwork, the plaintiff had the option to print out the handbook but did not do so; neither did any other employee of the plaintiff's store, to Owes' knowledge.[35]  At some point during the plaintiff's

---

[29] (Doc. 50-1 at 19-20; Doc. 50-2 at 16; Doc. 52-3 at 11-12; Doc. 52-4).

[30] (Doc. 50-2 at 15-17; Doc. 50-4 at 29).

[31] (Dec. 50-2 at 19-20; Doc. 50-4 at 26-27).

[32] (Doc. 52-1 at 15; Doc. 52-4 at 34).

[33] (Doc. 50-4 at 47).

[34] (Doc. 50-2 at 10, 12-13).

[35] (*Id*. at 16; Doc. 52-2 at 5).

employment, Owes printed a copy of the handbook and left it in the store.[36]  If employees create a user name and password when completing their online paperwork, they can log in to the platform remotely at other times and access the handbook.[37]

Between November 24, 2016, when she completed her online paperwork, and February 13, 2017, when her employment was terminated, the plaintiff did not obtain or review the employee handbook and did not know the defendant's policy regarding whom to contact if she wanted FMLA leave.  She did not know whether the FMLA applied to employees of the defendant and, until approximately February 8, 2017, she was unaware of the FMLA's existence.[38]

The defendant trained its newly acquired managers, but it did not address the FMLA policy with them.[39]  When the plaintiff sought time off to assist her hospitalized mother in February 2017, Owes did not know what the defendant's FMLA policy was, because no one had ever told her and she had never read the policy.[40]  The defendant advertised its "respect policy" by placing posters in its restaurants that advised employees to contact Human Resources, but it did not do so with regard to its FMLA policy or its notice requirement.[41]

---

[36] (Doc. 52-2 at 14).  The defendant says that Owes printed the handbook on the November day her employees completed their online paperwork and that she left the handbook on a file cabinet in the office, (Doc. 51 at 4), but its citations to the record do not support those time and place details.

[37] (Doc. 52-3 at 12-13).

[38] (Doc. 50-4 at 4-5, 30, 45, 47).

[39] (Doc. 50-1 at 11; Doc. 50-2 at 10).

[40] (*Id.* at 12-13, 20).

[41] (Doc. 52-3 at 7-8).

As noted, the defendant's FMLA policy requires employees to "notify their supervisor and Human Resources for approval for a leave."[42]  It is the defendant's policy (not expressed in the handbook) that a manager, upon becoming aware of an employee's need for leave that might qualify for FMLA leave, must inform the employee of their entitlement to FMLA leave and must tell the employee to contact Human Resources, and managers are so instructed.  Furthermore, Human Resources will accept notice from a store manager in lieu of the employee.[43]

The following facts regarding the plaintiff's efforts to obtain leave are also uncontroverted.  On Friday, February 3, 2017, the physician for the plaintiff's mother advised the family that the mother had a serious infection that would require hospitalization and surgery.  On Saturday, February 4, 2017, the physician called the mother to advise that, because her culture from the previous day showed growth, and because her clinical examinations showed deterioration over the past few days, she would be admitted to the hospital over the weekend, with a procedure set for Monday.[44]  The plaintiff worked her shift Saturday afternoon, and while there she told Owes that her mother was in a life-or-death situation that required surgery, and that she needed a week off to be with her.  Owes said to take all the time she needed.[45]

On Sunday, February 5, 2017, the plaintiff's mother was admitted to the hospital.  The plaintiff ended up finding her own substitute to cover her Sunday evening shift.[46]  About 7:00 p.m., Owes informed the plaintiff that she (Owes) would not work the 11 a.m. to 8 p.m. shift on Monday the sixth because she had

---

[42] (Doc. 52-4 at 20).

[43] (Doc. 50-1 at 16-17, 41-42).

[44] (Doc. 50-4 at 5-6; Doc. 50-5).

[45] (Doc. 50-2 at 26; Doc. 50-4 at 3, 7-8, 45).

[46] (Doc. 50-2 at 36; Doc. 50-8 at 4).

pink eye and that the plaintiff would have to work the shift instead; the plaintiff responded that Morrissette would have to find someone to work in her place.[47] She then texted Morrissette, "Can you get someone to cover my shift for a few days please i have to be with my momna [sic] right now," to which Morrissette responded, "Let [Owes] know.  I have no one."[48]  The plaintiff related this response to Owes, who tried to reach Morrissette, but Morrissette would not answer the phone or text Owes back.[49]  The plaintiff ultimately did not work on Monday.

The plaintiff was scheduled to work from 4:30 a.m. to 2:00 p.m. on Tuesday, February 7.[50]  On the night of Monday, February 6, Owes texted the plaintiff to ask, "Are you going to be able to open in the morning?"[51]  The plaintiff responded, "no I might can't come back for a few days," and Owes understood the plaintiff had requested this time off to care for her mother.[52]  Owes nevertheless changed her query to a command, instructing the plaintiff to open the store Tuesday morning because Owes had a morning medical appointment; the plaintiff responded, "ok."[53]

On Tuesday, February 7, the plaintiff overslept due to caring for her mother, but she came in and did her job, leaving late morning after Owes arrived to relieve her.  Owes wrote up a verbal warning disciplinary notice for tardiness.[54]

---

[47] (*Id*. at 7).

[48] (Doc. 50-7 at 1-2).

[49] (Doc. 50-8 at 9).

[50] (Doc. 50-9).

[51] (Doc. 50-8 at 10).

[52] (*Id*.; Doc. 50-2 at 47).

[53] (Doc. 50-8 at 11-12).

[54] (Doc. 50-2 at 44-45; Doc. 50-4 at 13, 34; Doc. 50-8 at 12; Doc. 50-10 at 2).

The plaintiff was scheduled to work the early shift on Wednesday, February 8.[55]  The plaintiff had by this time asked for leave due to her mother's hospitalization twice (on Saturday and Sunday) and had then reminded Owes of her unavailability (on Monday).  Owes had told her on Saturday to take all the time she needed and, while she had then required the plaintiff to work a partial shift on Tuesday morning when Owes could not cover for her, Owes did not request or demand that the plaintiff work her Wednesday shift.  The plaintiff concluded, reasonably, that she was not required to report to work on Wednesday.[56]

Around 7:00 a.m. on Wednesday, Owes texted the plaintiff, "You supposed to been to work this morning today was supposed to be me off day I take that as a no call no show."[57]  Even though Owes admits it was not the plaintiff's job to find a replacement but the responsibility of Owes and Morrissette to do so, Owes wrote up a "final written warning" based on the plaintiff's failure to show up for work.[58]  Around 8:00 a.m., Morrissette (who had been silent since Sunday evening) texted the plaintiff, "No call no show this morning?  No phone call.  One more will lead to termination."[59]

The plaintiff was not scheduled to work on Thursday the ninth or Friday the tenth, but she was scheduled to work Saturday the eleventh and Sunday the twelfth.[60]  On or about Wednesday the eighth, the plaintiff learned from her aunt about the existence of the FMLA and her right to leave, and on that date she went

---

[55] (Doc. 50-9).

[56] (Doc. 50-4 at 35; Doc. 52-1 at 10-12).

[57] (Doc. 50-8 at 13).

[58] (Doc. 50-2 at 47; Doc. 50-10 at 3).

[59] (Doc. 50-7 at 3).

[60] (Doc. 50-9).

to the store office and told both Owes and Morrissette that she needed to file FMLA, which they said was fine.[61]  The plaintiff handed Morrissette a note from her mother's doctor and told Morrissette that her mother was in a very bad state and that she needed time off to tend to her.[62]  The plaintiff asked Morrissette how to go about obtaining FMLA leave, but Morrissette never – then or later – told her she needed to call Human Resources.[63]  On Wednesday and Thursday, the plaintiff asked Morrissette several times – both in person and by text – for the forms needed to file for FMLA leave, and Morrissette's response was always that she was working on it.[64]  The plaintiff also asked Owes for help in obtaining FMLA leave, but Owes said to deal with Morrissette because she knew nothing about the FMLA.[65]

On the morning of Thursday the ninth, the plaintiff requested by text that Morrissette get her the necessary papers by Friday so as to avoid another no call no show.  Morrissette responded that she "need[ed] a phone call."  Two hours later, Morrissette texted that she had not forgotten but was "waiting on the response."  Four hours later (after a reminder from the plaintiff), Morrissette texted, "Give me to after this webcast and I'll call again."  About an hour later, Morrissette sent a cryptic message:  "April.thomas@gpshospitality.com."[66] Thomas was the defendant's Human Resources employee in charge of FMLA administration,[67] but the plaintiff did not know that, and Morrissette did not tell

---

[61] (Doc. 50-2 at 28; Doc. 50-4 at 4-5, 42-44).

[62] (*Id*. at 17, 20-21).

[63] (*Id*. at 43, 47).

[64] (*Id*. at 18, 43; Doc. 50-7 at 6-8).

[65] (Doc. 50-2 at 27; Doc. 50-4 at 45).

[66] (Doc. 50-7 at 7-9).

[67] (Doc. 52-3 at 4).

her; nor did Morrissette tell the plaintiff she needed to contact Thomas in order to request FMLA leave.  The plaintiff, not understanding this unexplained text, called Morrissette and asked for help because she did not know what to do.  Morrissette responded, "I sent you what you needed, figure it out on your own."  The plaintiff clicked on the link, but it brought her to a whole lot of confusing stuff.[68]

On Monday, February 13, barely a week after first requesting leave, the plaintiff's employment was terminated.

To summarize, the defendant's FMLA policy requires an employee to give notice to both her supervisor and Human Resources.  The defendant also requires a manager receiving notice of a potentially FMLA-qualifying need for leave to tell the employee to contact Human Resources.  The plaintiff gave Owes notice of her need for potentially FMLA-qualifying leave on at least February 3, February 5 and February 8.  The plaintiff gave Morrissette notice of her need for potentially FMLA-qualifying leave on at least February 4 and February 8.  Neither Owes nor Morrissette, however, though both are managers, told the plaintiff to contact Human Resources.  The responsibility for the plaintiff's failure, therefore, lies with the defendant.[69]

The defendant quibbles with the characterization of the manager's responsibility as being "policy," (Doc. 55 at 15), but that is the word the defendant's witness employed, and the deposition excerpt on which the defendant relies does not retract it, at least not with respect to telling the employee to contact Human Resources.[70]  But the broader point is that, regardless of whether the

---

[68] (Doc. 50-4 at 21-23).  The defendant recognizes this testimony as standing for the proposition that the plaintiff tried the e-mail link but it did not work.  (Doc. 55 at 11).

[69] This is so for two reasons.  First, Owes and Morrissette are the defendant's representatives, and their failure is the defendant's failure.  Second, the defendant neglected to advise Owes (and presumably Morrissette) of their duties upon receiving notice of a potentially FMLA-qualifying need for leave.  (Doc. 50-2 at 14).

[70] (Doc. 50-1 at 18).

obligation is mentioned in the employee handbook or formalized in a "policy," the defendant "require[s]" its managers "to tell the employee to reach out to human resources."[71] There is no room for debate in that absolute statement.

The defendant's only other argument is that it is really the plaintiff's fault she did not contact Human Resources, on the theory that the employee handbook states she had to do so and that she was constructively aware of this requirement. The handbook, however, requires the employee to contact both her supervisor and Human Resources, and it does not require that the latter notice precede the former. (On the contrary, an instruction for the manager to tell the employee to contact Human Resources would be superfluous if the defendant required or expected that an employee's notice would always be made initially to Human Resources.) The plaintiff therefore followed the notice requirement by giving notice first to Owes and Morrissette; at that point, the burden shifted to Owes and Morrissette to direct the plaintiff to Human Resources, a burden they failed to satisfy.

The defendant has chosen a particularly bad set of facts for arguing that the plaintiff was required to contact Human Resources without management fulfilling its duty of telling her to do so. It is uncontroverted that it was impossible for employees to read the employee handbook in the amount of time allocated for them to complete all their employment paperwork, and it is more than a little unrealistic to expect an employee bombarded with a 31-page handbook on top of all her employment papers to absorb and retain, in the span of a few minutes, the mounds of minutiae contained therein even could she clap eyes on the whole. Nor did the defendant train its newly acquired employees on the FMLA policy or post notice information in the plaintiff's store, as it did for its respect policy. Even Owes, as store manager, was wholly ignorant of the defendant's FMLA policy – as, it appears, was Morrissette.

The defendant argues that its cavalier approach to informing employees of its FMLA notice requirements is immaterial because the plaintiff could have

---

[71] (*Id*. at 16-17).

printed out the handbook when she completed her employment paperwork, could have reviewed the copy of the handbook kept in the store office, or could have found the handbook online.  Perhaps, but by the same token the plaintiff could have asked Owes and Morrissette for FMLA-qualifying leave – as she did – which likewise should have resulted in the plaintiff's timely awareness of how to proceed.[72]

"What circumstances qualify as 'unusual' is not well defined in the regulations or in case law …." *Villegas v. Albertsons, LLC*, 96 F. Supp. 3d 624, 632 (W.D. Tex. 2015).  However, included among the fact patterns in which the "unusual circumstances" qualifier has been successfully invoked are those "involv[ing] circumstances where … the employer was at least partially to blame for the employee's failure to comply." *Francisco v. Southwestern Bell Telephone Co.*, 2016 WL 4376610 at *2 (S.D. Tex. 2016).  This is consistent with the only example of unusual circumstances offered by the regulations:  that of an employee who cannot give notice at the number specified by the employer because there is no one to answer the call-in number and the voice mail box is full.  29 C.F.R. § 825.302(d).

Regardless of whether the plaintiff should have known from the handbook that she was required to contact Human Resources, from the moment she advised

---

[72] The defendant argues that Morrissette complied with its requirement of advising an employee to contact Human Resources when she texted the plaintiff April Thomas's e-mail address on February 9.  (Doc. 55 at 17).  This obscure action, the significance of which Morrissette refused to share with the plaintiff, patently does not support the proposition that Morrissette "instructed Plaintiff to contact April Thomas to request FMLA leave."  (Doc. 58 at 2).  Moreover, and as discussed in Part I.E, the defendant had already unlawfully interfered with the plaintiff's FMLA rights prior to Morrissette's text, which text could not unring that bell even had it accomplished what the defendant contends.

The defendant also stresses that the number for Human Resources was one of many listed on the communication board in the store office.  (Doc. 55 at 13-14; Doc. 52-2 at 14).  The simple posting of a telephone number, however, imparts no information about when it is to be used and would not, in any event, relieve Owes and Morrissette of their duty to advise the plaintiff to contact Human Resources.

Owes of her need for FMLA-qualifying leave she was entitled by the defendant's own policy to be told or reminded to do so. Because the defendant violated its own rules regarding FMLA notice, and because it offers no argument or evidence that the plaintiff would have ignored this information had she been given it, the defendant is at least partially to blame for the plaintiff's failure to contact Human Resources.

Several cases have indicated that the presence of unusual circumstances is a question of fact, typically citing *Millea v. Metro-North Railroad Co.*, 658 F.3d 154 (2nd Cir. 2011), for this proposition. The *Millea* Court stated only that the plaintiff's inability *vel non* to give personal notice (which inability would give rise to an unusual circumstance) was a question of fact. *Id*. at 162. The Court agrees that if the facts underlying an asserted unusual circumstance are in dispute, the jury must find those facts. However, when (as here) those facts are uncontroverted, whether they give rise to unusual circumstances precluding the defendant from enforcing its notice and procedural requirements is a question of law. For reasons stated, the Court concludes as a matter of law that this case presents unusual circumstances justifying the plaintiff's failure to notify Human Resources.

### 3. Timing and content.

For reasons expressed in Parts I.D.1 and I.D.2, the defendant's motion for summary judgment is due to be denied. The resolution of the plaintiff's motion for summary judgment requires further consideration of the notice requirement.

The plaintiff learned on February 3 that her mother would require hospitalization, though she did not then know when this would occur. On February 4, she learned that her mother would be hospitalized the following day and undergo a procedure the day after. On February 4, the plaintiff notified Owes that her mother was in a life-or-death situation and that she needed a week off. On February 5, the plaintiff notified Morrissette that she needed to be off a few days

to be with her mother.  On February 6, the plaintiff reminded Owes that she could not work for a few days.  Owes concedes that the plaintiff on each of these occasions communicated a request for time off to care for her hospitalized mother.[73]

The parties do not address whether the plaintiff requested leave that was foreseeable or unforeseeable.  "[A]n employee's need for leave is foreseeable if it is based on planned medical treatment."  *White*, 789 F.3d at 1196.  The plaintiff learned of the need for medical treatment on February 3 and learned of the timing of the medical treatment on February 4.  It is not clear on which side of the *White* line this scenario falls, but the plaintiff's notice satisfied the timing and content requirements of both foreseeable and unforeseeable leave.

If the need for leave was foreseeable, the plaintiff was required to give notice "as soon as practicable," which usually means "either the same day or the next business day."  29 C.F.R. § 825.302(a), (b).  If the need for leave was unforeseeable, the plaintiff was required to give notice "as soon as practicable under the facts and circumstances of the particular case," *id*. § 825.303(a), and "[g]iving notice the very next day assuredly meets the timing standard of practicability."  *White*, 789 F.3d at 1197.  The plaintiff gave notice to Owes on February 4, the day after she learned that her mother would at some point require hospitalization and the very same day she learned that hospitalization was imminent.  The plaintiff thereby satisfied the timing requirement of notice; the defendant asserts no argument to the contrary.

If the need for leave was foreseeable, the plaintiff was required to provide notice "sufficient to make the employer aware that [she] needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c).  If the need for leave was unforeseeable, the plaintiff was required to provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  *Id*. § 825.303(b).  In both cases, "such

---

[73] (Doc. 50-2 at 47).

information may include that … the employee's family member is under the continuing care of a health care provider." *Id*. §§ 825.302(c), 825.303(b). The plaintiff's February 4 notice to Owes related that her mother was in a life-or-death situation requiring surgery and that the plaintiff needed a week off to be with her, which Owes understood as being to care for her hospitalized mother. This information fully covered all the bases of need, FMLA-qualifying reason, timing and duration. The defendant makes no argument to the contrary.

As noted, the Court rejects the defendant's argument that the plaintiff was required to give notice to Human Resources. Therefore, the plaintiff was required to provide notice only "to the same person(s) within the company the employee ordinarily contacts to request other forms of leave," which is "usually the employee's supervisor."[74] Pursuant to the employee handbook, an employee ordinarily is to make requests for scheduled and unscheduled leave to her supervisor or a manager.[75] Owes was both the plaintiff's supervisor and a manager. "Once the employee has provided notice to the supervisor or other appropriate person in the usual manner, the employee's obligation to provide notice of the need for FMLA leave has been fulfilled."[76] The plaintiff therefore provided timely, adequate notice to the appropriate person. The defendant makes no argument to the contrary beyond its rejected one that the plaintiff was required to contact Human Resources.

### E. Interference.

An interference claim requires the plaintiff to prove that the defendant "denied or otherwise interfered with his substantive rights under the Act." *Pereda*

---

[74] 60 Fed. Reg. at 2,220.

[75] (Doc. 52-4 at 14, 22-23).

[76] 60 Fed. Reg. at 2,220.

*v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012).  The substantive right involved here is the right to take FMLA leave.

As demonstrated in Parts I.A-I.D, the plaintiff had the substantive right to take FMLA leave as of February 4, 2017.  Rather than grant her request, pass the request to Human Resources or tell the plaintiff to do so, Owes required the plaintiff to work on February 5, 7, 8 and 12.[77]  This constituted an effective denial of the plaintiff's request for FMLA leave.  *See Simmons v. Indian Rivers Mental Health Center*, 652 Fed. Appx. 809, 819 (11th Cir. 2016) (requiring an employee to perform work while on FMLA leave constitutes an actionable interference with the employee's FMLA rights).  Because "the employer's motives are irrelevant," *Strickland v. Water Works and Sewer Board*, 239 F.3d 1199, 1208 (11th Cir. 2001), the plaintiff's interference claim is complete.

The plaintiff claims that her termination on February 13 also interfered with her substantive FMLA rights.  An employer interferes with substantive rights under the FMLA when it terminates an employee entitled to FMLA leave.  *E.g., Spakes v. Broward County Sheriff's Office*, 631 F.3d 1307, 1309-10 (11th Cir. 2011) (plaintiff terminated upon requesting FMLA leave, thereby preventing her from taking such leave); *Strickland*, 239 F.3d at 1208 (plaintiff terminated promptly after leaving the worksite while, under his version of the facts, entitled to FMLA leave).  On such a claim, the plaintiff need not "prove a causal connection between her leave request and her termination," because "the employer's motives are irrelevant"; rather, the employer must prove, as an affirmative defense, "that it would have discharged [the plaintiff] for a reason wholly unrelated to the FMLA leave."  *Spakes*, 631 F.3d at 1310 (internal quotes omitted).

The plaintiff does not address whether she was still entitled to FMLA leave at the time she was terminated, so as to fall within the pattern of *Spakes* and

---

[77] The plaintiff was required to find her own substitute for her February 5 shift, which she did.  The record is not clear whether the plaintiff worked on February 11 as scheduled.

*Strickland*, and the Court perceives no clear answer.  Because the plaintiff's mother remained hospitalized and the plaintiff continued to care for her, the plaintiff maintained a qualifying reason for FMLA leave, but it is unclear whether her requests for leave sought time off for any period following her February 12 shift.

Termination can also constitute interference when an employer discharges an employee while out on FMLA leave, thereby interfering with the employee's substantive right to reinstatement following FMLA leave.  *E.g., O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-55 (11th Cir. 2000).  Because the plaintiff was denied FMLA leave, it is not clear that a right to reinstatement at the conclusion of such leave was ever triggered, and the plaintiff does not address the issue.

Rather than seeking to fall within either of these common paradigms, the plaintiff proposes a new one.  The plaintiff notes that her termination, according to Owes, was based on: her tardiness for her February 7 shift; her failure to show for her February 8 shift; her tardiness for her February 12 shift; and her insubordination during her February 12 shift, which stemmed from a disagreement over the plaintiff's requested FMLA leave.  (Doc. 50 at 18-20).  The Court agrees that the evidence probably would preclude the defendant from successfully raising as an affirmative defense that the discharge was wholly unrelated to FMLA leave, but the antecedent question is whether termination based on infractions occurring while the employee is working due to an improper denial of FMLA leave renders the termination an interference with the plaintiff's substantive rights under the FMLA.  The position is not implausible, but the plaintiff offers no authority in support, and the Court declines to fill in the gaps on her behalf.

### F.  Summary.

The defendant's only argument in support of its motion for summary judgment – that the plaintiff's failure to contact Human Resources disqualified her

from receiving FMLA leave – fails for two reasons:  (1) the FMLA and its implementing regulations do not permit an employer to deny FMLA leave based on FMLA-specific notice requirements of the employer that exceed the employer's notice requirements applicable to other forms of leave; and (2) even if heightened notice requirements unique to FMLA leave requests are enforceable, the defendant's violation of its own requirement that its managers direct employees requesting potentially FMLA-qualifying leave to contact Human Resources places on the defendant the blame for the plaintiff's failure to contact Human Resources, and these unusual circumstances justify the plaintiff's failure to comply with the defendant's FMLA-specific notice requirement.  For both reasons, the defendant's motion for summary judgment is due to be denied.

Based on the law and uncontroverted facts:  (1) the defendant is a covered entity; (2) the plaintiff is an eligible employee; (3) the plaintiff had a qualifying reason for taking FMLA leave; (4) the plaintiff gave timely and adequate notice to the appropriate representative of the defendant; and (5) the defendant thereafter denied the plaintiff her substantive right to FMLA leave by requiring her to work despite her request for leave.  The plaintiff's motion for summary judgment as to her interference claim is therefore due to be granted with respect to liability based on denial of FMLA leave.  Because legal questions remain unanswered, the plaintiff's motion for summary judgment with respect to liability based on her termination is due to be denied.  Because the plaintiff did not address damages or any other remedy, her motion for summary judgment with respect to relief is due to be denied.

## II.  Retaliation.

FMLA retaliation claims are subject to the familiar burden-shifting framework applicable to other employment retaliation claims.  *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  First, "a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she

suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." *Id*. If the plaintiff succeeds, "the burden shifts to the employer to articulate a non[retaliatory] reason for the adverse action." *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). If it does so, the plaintiff must "demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id*. (internal quotes omitted).

The defendant first argues that the plaintiff's failure to contact Human Resources to request leave precludes her from showing that she engaged in statutorily protected activity. (Doc. 51 at 20-21). Because, as discussed in Parts I.D.1 and I.D.2, the plaintiff was not required to contact Human Resources in order to satisfy all applicable notice requirements, her failure to do so does not prevent her from establishing the first element of her prima facie case.

As to the remaining elements of a prima facie case, termination is unquestionably an adverse employment action, and the close temporal proximity between the plaintiff's termination and her protected conduct – of which both Owes and Morrissette were aware – easily satisfies the causal element.[78]

The defendant identifies its legitimate, nonretaliatory reason for terminating the plaintiff as follows: that, on February 12, the plaintiff refused to work her assigned schedule, called Owes a bitch, and told her to come get her store, (Doc.

---

[78] "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection," so long as the decisionmaker is aware of the protected activity. *Brungart*, 231 F.3d at 799. The plaintiff requested FMLA leave, and sought assistance in making such a request, on at least February 4, 5, 6, 8 and 9; she was terminated on February 13, a remarkably close temporal proximity. *Cf. Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks constituted close temporal proximity satisfying the causal relation element of the plaintiff's prima facie case).

51 at 21-22), conduct Owes described as insubordination.[79]  This is a legally permissible reason for termination, and the defendant has presented evidence both that the episode occurred and that Owes relied on it.  The plaintiff, however, has ample evidence allowing a properly functioning jury to find that the defendant's articulated reason is a pretext for unlawful retaliation.

First, the exceptionally close temporal proximity between the plaintiff's protected activity and her termination remains equally powerful evidence at the pretext stage of analysis.  *See Reeves v. Sanderson Plumbing Products, Inc*., 530 US. 133, 143 (2000) ("[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom … on the issue of whether the defendant's explanation is pretextual ….") (internal quotes omitted); *Hurlbert v. St. Mary's Health Care System, Inc*., 439 F.3d 1286, 1298 (11th Cir. 2006) ("The close temporal proximity between Hurlbert's request for leave and his termination – no more than two weeks, under the broadest reading of the facts – is evidence of pretext, though probably insufficient to establish pretext by itself.").

Second, Owes admits that the plaintiff had called her "bitch" on one or two occasions in the recent past without Owes disciplining or even correcting the plaintiff for doing so; on the contrary, the two continued to be on friendly terms and to have a good working relationship thereafter.[80]  Indeed, there is evidence that Owes periodically called the plaintiff a bitch as well, including on February 12.[81]  In showing pretext, "[e]vidence that similarly situated employees were treated differently is of probative value …."  *United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir. 1995).  As the plaintiff states, she "is her own best

---

[79] (Doc. 50-10 at 1).

[80] (Doc. 54-2 at 28-29, 38).

[81] (Doc. 54-4 at 38-40).

comparator." (Doc. 54 at 29). For Owes to suddenly treat the plaintiff's language as a terminable offense after tolerating it and engaging in it herself undermines the defendant's position that the plaintiff was discharged due to her choice of words.

In a similar vein is Owes' inconsistent treatment of the plaintiff regarding tardiness and absences. Owes concedes that, prior to her final week of employment, the plaintiff had been late and had been a no call no show, yet Owes had never disciplined her.[82] Only during that final week, immediately after the plaintiff invoked her FMLA rights, did her absences and tardiness become a disciplinary issue, and a reasonable jury could conclude that this alteration was prompted by the plaintiff's protected conduct and that her termination was similarly motivated.

The defendant does not now assert that the plaintiff's two episodes of lateness and one no call no show were reasons for her termination. This is a changed position, as Owes testified that the plaintiff was terminated for being late and for being a no call no show.[83] So also the defendant in its interrogatory responses identified "excessive absenteeism" as a reason for the plaintiff's termination.[84] "We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert*, 439 F.3d at 1298.

Most damaging to the defendant is Owes' admission that she was frustrated and angry because the plaintiff's need for leave was forcing Owes to work extra shifts and longer hours. The plaintiff meanwhile remained unsatisfied, because she was still having to work some shifts, and this situation created the tension

---

[82] (Doc. 54-2 at 25-26).

[83] (*Id*. at 25).

[84] (Doc. 54-12 at 2).

between the two.[85]  A reasonable jury could conclude that Owes was simmering with resentment because of the plaintiff's efforts to obtain FMLA-protected leave and simply snapped on February 12, firing her based on those efforts.

The plaintiff's version of the events of February 12 only strengthens the retaliatory inference.  When the plaintiff showed up for her shift on February 12, she saw the schedule Owes had prepared for the next week, which had the plaintiff working overnight shifts.[86]  The plaintiff called Owes and told her she could not work all those overnights because she had to tend to her mother.[87]  In the course of this conversation, the plaintiff told Owes to "stop acting like a bitch," to which Owes responded, "you're a bitch."[88]  Shortly after this conversation, the plaintiff texted Owes, "I'm not about to work all these overnight [sic]."  Owes responded, "Now you want to text me and you are not allowed to open anymore."  Owes expressed resentment that the plaintiff "just come in like I owe you" and concluded, "So see what [Morrissette] has to say about your schedule."  The plaintiff replied, in three rapid-fire texts, "OK, so what I'm not doing it"; "ok that find [sic]"; and "you can come and get your store I'll leave."[89]  Based on this exchange, a reasonable jury could find that the plaintiff expressed a desire not to work overnight shifts due to an FMLA-qualifying reason and that Owes, taking offense at the plaintiff's presumption, promptly fired her precisely because she – yet again – sought FMLA leave.

---

[85] (Doc. 54-2 at 55-56).

[86] (Doc. 50-2 at 22-23).

[87] (Doc. 54-4 at 37).  Owes denies that the plaintiff said why she would not work overnights, (Doc. 54-2 at 24), but on the defendant's motion the plaintiff's version must be credited.

[88] (Doc. 54-4 at 39-40).

[89] (Doc. 52-5 at 23-25).  The plaintiff did not leave the store before her shift ended.  (Doc. 54-4 at 40).

The foregoing is not an exhaustive catalogue of evidence that could support a jury determination of pretext, but it is more than sufficient to demonstrate that a reasonable jury could find the defendant's articulated non-retaliatory reason a pretext for unlawful retaliation.

The defendant ignores this evidence and the reasonable inferences therefrom, instead insisting that "[i]ntervening acts of misconduct … can break the causal chain" between protected activity and adverse employment action.  (Doc. 51 at 21 (citing *Hankins v. AirTran Airways, Inc*., 237 Fed. Appx. 513 (11th Cir. 2007)).  To the extent the defendant suggests that intervening acts of misconduct can trump close temporal proximity for purposes of establishing a prima facie case, the Court has already rejected that aspect of *Hankins*.[90]  To the extent the defendant suggests that intervening acts of misconduct can preclude a plaintiff from establishing causation at the pretext stage, the proposition is unobjectionable, but the operative word is "can."  Given the plaintiff's plentiful evidence of pretext, it will be for the jury to determine whether the defendant terminated the plaintiff for misconduct or for engaging in protected activity under the FMLA.[91]

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **denied**.  The plaintiff's motion for partial summary judgment is **granted** with respect to liability on her interference claim to the extent based on a denial of FMLA leave and is in all other respects **denied**.

DONE and ORDERED this 3rd day of June, 2019.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[90] *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1343-45 (S.D. Ala. 2012).

[91] The plaintiff's arguments regarding pretext focus on Owes, and the defendant advances no argument that Owes was not the decisionmaker.  The Court therefore assumes for present purposes that it is the mental state of Owes that matters for purposes of the plaintiff's retaliation claim.